BULLOCK ELECTRIC MFG. CO. et al. v. CROCKER-WHEELER CO.

(Circuit Court, D. New Jersey. September 19, 1905.)

1. PATENTS—LICENSE—CONSTRUCTION OF CONTRACT.
   A license contract, giving defendant the right to use certain inventions made by complainant, construed, and *held* to expressly except therefrom the invention covered by the patent in suit.

2. SAME—ANTICIPATION—EVIDENCE OF DATE OF INVENTION.
   Declarations of a patentee relating to his invention, accompanied by descriptions thereof, and made before his application for a patent was filed, are competent evidence to carry the date of his invention back to the time when they were made.

3. SAME—VALIDITY—EFFECT OF CANCELLATION OF CLAIM.
   The cancellation of a claim in an application for a patent, while it is pending in the Patent Office, does not affect the validity of a retained claim which is substantially the same, although, if susceptible of two constructions, it will not be so construed as to cover the canceled claim.

4. SAME—INFRINGEMENT—ELECTRICAL DISTRIBUTION.
   The Leonard patent, No. 478,344, for a system of electrical distribution, discloses invention, and was not anticipated by the Smith patent, No. 471,063, which, although prior in date and time of application, is based on an invention made at a later date than that of Leonard. Also *held* infringed as to claims 1, 2, 4, 8, and 9.

In Equity. Suit for infringement of patent. On final hearing. See 121 Fed. 200.

M. B. Phillipp and Clifton V. Edwards, for complainants.
Charles E. Mitchell, Herbert Noble, and Thomas Ewing, Jr., for defendant.

LANNING, District Judge. The complainants seek an injunction to restrain the defendant from an alleged infringement of patent No. 478,344, granted to the complainant Harry Ward Leonard July 5, 1892, of which he is the present owner, and under which the other complainant, Bullock Electric Manufacturing Company, claims to be sole licensee. The defenses are that the defendant has a license to do the acts complained of under a contract between Leonard and it dated May 5, 1896, that the patent is invalid, and that the defendant does not infringe.

First, as to the alleged license. This defense was set up by a plea to the bill, and, on a replication thereto and proofs, was overruled by the late Judge Kirkpatrick, whose opinion will be found in 126 Fed. 375. His order overruling the plea provided that the defendant "have leave to file such answer as it may be advised on or before rule day in January, 1904." Under the supposed authority of this provision this defense is now presented a second time, and the defendant requests the court to consider it, because, it is said:

"New matter has been introduced into the present record that was not before Judge Kirkpatrick, and therefore the question as to whether the defendant is licensed under the patent in suit should be considered and determined in view of the further light thrown upon the proper construction of the license."

Waiving the question concerning the regularity of such practice, I have complied with the request. The contract of May 5, 1896, recites that the Crocker-Wheeler Electric Company, then the owner of certain applications for patents specifically described in the recitals, had by an agreement of that date assigned those applications, and the patents to be obtained thereon, to the complainant Harry Ward Leonard, and that Leonard was then the owner of certain other patents and applications for patents, also specifically described in the recitals, amongst which latter were mentioned:

"No. 463,802 for electrical transmission of power, granted to said Harry Ward Leonard November 24, 1891; * * * No. 476,544 for a system of electrical distribution, granted to said Harry Ward Leonard June 7, 1892; and No. 478,344, for a system of electrical distribution, granted to the said Harry Ward Leonard July 5, 1892."

After its recitals, the agreement proceeds thus:

"Now, therefore, in consideration of the said assignment of the said Crocker-Wheeler Electric Company to the said H. Ward Leonard, the undersigned, the said H. Ward Leonard, grants to the said Crocker-Wheeler Electric Company a nonexclusive, nonassignable license, without limitation or condition or royalty to be paid by it or the purchasers of the apparatus, except as hereinafter specified, to make, use, sell, and practice for the regulation or control of dynamo electric machinery, for the purpose, except respecting patent No. 478,344, of regulating or controlling electric motors of its own manufacture, and for no other purpose, except as hereinafter provided in section 1, page 4, throughout the United States and the territories thereof, any of the inventions aforesaid, whether assigned by the said Crocker-Wheeler Electric Company to the said Leonard, or already owned by him, the said license being given under the aforesaid applications and patents, and any patents, reissues, or extensions which may be hereafter granted upon the said inventions, or any of them, for the full term or terms of the said patents, reissues, and extensions."

By Judge Kirkpatrick's construction of this contract it was held that the license thereby granted did not include patent No. 478,344. The "new matter" now presented is a tripartite agreement dated April 27, 1896, and executed by Harry Ward Leonard, the Crocker-Wheeler Electric Company, and Otis Bros. & Co. By this agreement it was declared that, "if this contract can be consummated within one month, the Crocker-Wheeler Company will assign all applications and inventions of Granville T. Woods assigned to it, to H. Ward Leonard, provided that the said Woods shall consent thereto in writing for the cash sum of $2,400, or less, in lieu of all sums and other considerations which are due or may become due to him as royalties or otherwise under a certain contract between him and the Crocker-Wheeler Company dated October 5, 1895." The agreement further declared that, subject to its conditions, Leonard would give to the Crocker-Wheeler Electric Company "a nonassignable, nonexclusive license without royalty and without limit to the extent of the employment thereof by the said Crocker-Wheeler Company, and its successor or successors in business, to make, use, and sell any of the inventions covered by the existing patents or applications to the said H. Ward Leonard," etc. The final paragraph of the agreement is as follows:

"And this agreement is further conditioned on the said Woods agreeing to transfer to the said Leonard all records relating to the matter in controversy in certain interferences relating to motor regulations now in possession of the Crocker-Wheeler Company, or its attorneys, or of the said Woods, and on the said Woods agreeing not to set up any date prior to the date of the transfers made to H. Ward Leonard in pursuance of this agreement in any controversy relating to motor regulations."

That this language was broad enough to require Leonard to include in his license to the Crocker-Wheeler Electric Company his patent No. 478,344, upon the performance of the conditions precedent in the agreement mentioned, is clear. But the proofs show that Woods never agreed to what the conditions called for. Furthermore, a comparison of the two agreements of April 27, 1896, and May 5, 1896, discloses such material differences between them as to dispel the idea that the later agreement was intended by the parties to it to be a carrying out of the former agreement. The agreement of May 5, 1896, must therefore be construed in the light of the evidence that was before Judge Kirkpatrick. I concur in his construction that that agreement does not include a license to use patent No. 478,344.

The defendant also contends that it is entitled to do the acts complained of as licensee under Leonard's patents, Nos. 463,802 and 476,544, both of which it is clearly entitled to use under the agreement of May 5, 1896. But, in view of the fact that by the construction above given the patent in suit is expressly excluded from the list of patents to which the license applies, the contention, if the patent in suit is to be deemed a valid one, cannot be sustained.

The second defense is that the patent in suit is invalid. In the specification of this patent Leonard says:

"My invention relates in part to the operation and regulation of electric motors. In my application filed August 14, 1891, serial No. 402,651" (for which patent No. 463,802 was granted on November 24, 1891, being the same date on which the application for the patent in suit was signed and sworn to, though it was not filed until November 27, 1891). "I have set forth a method of operating electric motors at any speed or any torque desired, and at the same efficiency under all conditions; such method consisting generally in maintaining the field magnet of the motor at a constant strength and varying the volts on the armature circuit to vary the speed, and the amperes on such circuit to vary the torque. One object of my present invention is to enable this method to be carried out without varying the electro-motive force of the generator which forms the source of supply for the system of conductors with which the motor armature is connected, and also without the necessity of employing an intermediate motor and generator, as was the case in the application referred to, when the motor was supplied from a system of conductors of constant electro-motive force. I thus avoid the loss due to the successive transformations of energy, and also save the cost of the intermediate transforming devices. To accomplish this, I make use of a system of distribution in which there are three or more conductors, between each of the different pairs of which are maintained different electro-motive forces, and I so arrange the motor and suitable switching or connecting devices that the motor armature may be connected between the different pairs of conductors, whereby two or more different electro-motive forces are obtained at its armature terminals; the field magnet of the motor being so arranged and connected as to be maintained at a constant strength."

Figure 1 of the patent will serve to illustrate its general features. It is as follows:

In his specification the patentee describes this figure as follows:

"Referring first to Fig. 1, A, A1, and A2 are three dynamo-electric machines of constant difference of potential, all run by the same engine or prime motor B. The three dynamos have their like terminals connected to a common con-

ductor, C, while each has its other terminal connected to an independent conductor, $C^1$, $C^2$, or $C^3$. These three generators are preferably constructed so that each has a different electro-motive force. For instance, A may be of 62.5 volts, $A^1$ of 187, and $A^2$ of 437 volts. D is an electric motor whose field magnet is wound for the full difference of potential of 437 volts, and is connected between conductors C and $C^3$, so that it receives a practically constant electro-motive force and is maintained at practically a constant strength. It is evident, however, that the field magnet may be wound for and connected between the common conductor and any one of the other conductors. The armature terminals of the motor are connected, respectively, with the arms, a, $a^1$, of a switch, E, which arms are insulated from each other and are movable independently. Arm a moves over the four contact blocks, 1, 2, 3, 4, which are electrically connected, respectively, with the four conductors, C, $C^1$, $C^2$, and $C^3$. Arm $a^1$ moves over contacts, 5, 6, 7, 8, connected, respectively, with the same conductors. It will be seen that in the position of the switch arms shown there is no difference of potential at the motor terminals, both being in connection with conductor $C^3$; but by moving the switch arms upon the contact blocks various differences of potential may be obtained. Thus, if the armature is connected between C and $C^1$ (that is, with the switch arms on blocks 2 and 5, or 6 and 1) the armature will receive only the 62.5 volts of generator A; if between C and $C^2$ (that is, blocks 5 and 3, or 1 and 7) there is obtained the 187 volts of generator $A^1$; or, if between C and $C^3$ (blocks 5 and 4, or 1 and 8), there is obtained the electro-motive force of $A^2$, or 437 volts. Connecting between $C^1$ and $C^2$ (blocks 6 and 3, or 2 and 7) gives the difference between A and $A^1$, or 125 volts. Between $C^2$ and $C^3$ is the difference between $A^1$ and $A^2$, or 250 volts; or between $C^1$ and $C^3$ gives 437—62.5—375 volts. I am thus enabled to obtain by the manipulation of the switch any one of the following voltages at the motor-armature terminals, viz., 62.5, 125, 187, 250, 375, or 437 volts, and each of these may be obtained in either direction, so that the motor may be reversed and run in either direction at any one of the different speeds which are attainable by these variations of electro-motive force. It will be understood that when the electro-motive force of one generator is opposed to that of the other the weaker generator is run as a motor and assists the prime motor in the operation of the other generator."

It will be observed that the four-wire system above shown gives six different speeds. A three-wire system will give but three different speeds. A five-wire system will give ten different speeds. The number of speeds is ascertained by multiplying the number of wires by the number of wires less one and dividing the product by 2. The six different speeds of the four-wire system above described are shown in the following figure:

The great advantage of such a system of electric distribution, especially in machine shops where tools are required to be operated at varying speeds, is apparent. The defendant contends, however, that the patent in suit is anticipated by patent No. 455,454, granted July 7, 1891, to Edwin Wilbur Rice, Jr. That is a patent for an improvement in electric railways. But it is shown by Messrs. Wagner and Kennel-

ly, two expert witnesses for the complainant, to fall far short of embodying the distinguishing features of the patent in suit. Professor Kennelly says:

"The Rice patent is for an electric railway motor system employing four conductors. These motors are series motors, or are not shunt motors such as are set forth in the patent in suit. Moreover, only three different voltages are obtainable by the method indicated in the Rice patent; that is to say, one motor terminal is permanently connected to one conductor, and ·the possible combinations of the systems are limited to the changes that can be made in the connection of the other terminal. These changes are three in number, or one less than the number of wires; whereas, in the Leonard system the field windings of the motors would be permanently connected to one pair of wires, and both of the armature terminals would be capable of connection to any of the four wires in appropriate combinations so as to obtain six different voltages and speeds. The Rice system would require seven wires to obtain as many voltages and speeds as the Leonard system ·of the patent in suit obtains with four wires."

The Smith patent, No. 471,063, is also referred to by the defendant's expert witnesses as an anticipation of the patent in suit. The application for this patent was filed November 11, 1891, 16 days before Leonard filed his application for the patent in suit, and was granted March 15, 1892, while Leonard's patent was not granted until July 5, 1892. If the Leonard patent is not defeated by the Smith patent, it seems unnecessary to refer to any of the other patents mentioned as anticipations of the Leonard patent; for the defendant's witness Mr. Eyre says that he knows of no patent prior to that of Smith which discloses a multiple-wire system of distribution, a shunt motor (or, as he prefers to call the motor described in the Leonard and Smith patents, a separately excited motor), and means for changing the connection of the motor from one of the wires of the system to another to vary the speed of the motor. Both the Leonard and Smith patents disclose this method of controlling the speed of motors. That it involves invention seems clear. In Loom Co. v. Higgins, 105 U. S. 591, 26 L. Ed. 1177, Justice Bradley said:

"It may be laid down as a general rule, though perhaps not an invariable one, that, if a new combination and arrangement of known elements produce a new and beneficial result never attained before, it is evidence of invention."

The question on this branch of the case therefore is: Was Leonard or Smith, in contemplation of the law, the original or first inventor? The same question is presented in the case of Otis Elevator Company v. Bullock Electric Manufacturing Company, in which the patent in suit is the Smith patent. That case was argued with this case on much the same proofs. Smith and Leonard were examined in both cases, and the question will be disposed of in this case.

In its answer to the bill of complaint the defendant alleges, upon information and belief, that:

"The said letters patent to Harry Ward Leonard, if construed so broadly as to cover and embrace any apparatus made, sold, or used by this defendant, are invalid because the same were surreptitiously and unjustly obtained by the said Harry Ward Leonard for what was invented in fact by another, to wit, Rudolph C. Smith of Yonkers, county of Westchester and state of New York, who was using reasonable diligence in adapting and perfecting the same."

In my judgment the defendant's proofs fail to support this allegation. The earliest date that Mr. Smith satisfactorily fixes for the disclosure of his invention to any one is November 5, 1891. Leonard, on the other hand, has introduced in evidence a description of his invention written out by him and containing also illustrative drawings. The written matter and the drawings are on pages 199 to 212 of a record book kept by him. At the end of the description, on page 212, are the following entries:

"Matters on pp. 199 to 212 explained to me by Mr. Leonard Oct. 3, 1891.
"[Signed]                                                    H. W. Seeley."
"Matters on pp. 199-212, inclusive, explained to me by Mr. Leonard prior to this date, viz., Oct. 5, 1891.
"[Signed]                                                    A. D. Vance.
"H. J. Westover.
"C. H. Bloomer.

"Oct. 5, 1891."

Mr. Seeley was Leonard's patent solicitor and is now dead, but his signature was duly proven. Mr. Vance and Mr. Westover have been sworn and testify to the genuineness of their signatures and the appended dates. Vance also testifies to the genuineness of Bloomer's signature. The first part of the written description is dated September 15, 1891. On September 16th Leonard wrote to William Sellers & Co. of Philadelphia, concerning his invention, and on October 30th, pursuant to arrangements with them, he went to Philadelphia to have his invention tested at their works. On November 2d Leonard wrote them requesting an early report on the test. On November 24th Leonard's application for a patent was sworn to by him. On November 27th the application was filed. And on November 28th Sellers & Co. sent to Leonard a report of the test made October 30th. I am satisfied that the test there made was the multiple-voltage system of the Leonard patent. Nor do I think the objection that the description of the invention in Leonard's record book, connected as it was with his explanation of it to four different persons, is incompetent evidence to carry the date of the invention back of the time when he filed his application in the patent office. In considering the question of the admissibility of such evidence, the Supreme Court, in Philadelphia & Trenton Railroad Co. v. Stimpson, 14 Pet. 461, 462, 10 L. Ed. 535, said:

"The next exception is to the admission of the evidence of William A. Stimpson, Richard Caton, and George Neilson, as to certain declarations and statements and conversations of the plaintiff as to his invention prior to the date of his original patent, in order to rebut the evidence of the defendants as to the invention or use by other persons of the same contrivance before that date. The objection is that, upon general principles, the declarations and conversations of a plaintiff are not admissible evidence in favor of his own rights. As a general rule this is undoubtedly true. It is, however, but a general rule, and admits and requires various exceptions. There are many cases in which a party may show his declarations comport with acts in his own favor, as a part of the res gestae. There are other cases, again, in which his material declarations have been admitted. Thus, for example, in the case of an action for an assault and battery and wounding, it has been held that the declarations of the plaintiff, as to his internal pains, aches, injuries, and symptoms, to the physician called to prescribe for him, are admissible for the purpose of showing the nature and extent of the injuries done to him.

See 1 Phillips on Evid. (8th Ed., 1838) pp. 200-202, c. 12, § 1. In many cases of, inventions it is hardly possible in any other manner to ascertain the precise time and exact origin of the particular invention. The invention itself is an intellectual process or operation, and, like all other expressions of thought, can in many cases scarcely be made known except by speech. The invention may be consummated and perfect, and may be susceptible of complete description in words, a month or even a year before it can be embodied in any visible form, machine, or composition of matter. It might take a year to construct a steamboat, after the inventor had completely mastered all the details of his invention, and had fully explained them to all the various artisans whom he might employ to construct the. different parts of machinery. And yet, from those very details and explanations, another ingenious mechanic might be able to construct the whole apparatus and assume to himself the priority of the invention. The conversations and declarations of a patentee, merely affirming that at some former period he invented that particular machine, might well be objected to. But his conversations and declarations stating that he had made an invention, and describing its details and explaining its operations, are properly to be deemed an assertion of his right at that time as an inventor, to the extent of the facts and details which he then makes known, although not of their existence at an antecedent time. In short, such conversations and declarations, coupled with a description of the nature and objects of the invention, are to be deemed a part of the res gestae, and legitimate evidence that the invention was then known to and claimed by him; and thus its origin may be fixed, at least, as early as that period. This view of the subject covers all the parts of the testimony of the witnesses objected to in the Circuit Court; and we are of opinion that the court were right in admitting the evidence."

And to the same effect are McCormick Harvesting Mach. Co. v. Minneapolis Harvester Works (C. C.) 42 Fed. 152, and Standard Cartridge Co. v. Peters Cartridge Co., 77 Fed. 646, 23 C. C. A. 367.

Leonard also was diligent in adapting and perfecting his invention. Whatever delay there was in the filing of his application, which was less than two months after he had disclosed it to other persons, seems to have been due to the illness of his patent solicitor. Disregarding the proofs on the question as to whether Smith did not "surreptitiously and unjustly" obtain a patent for what Leonard had invented, and assuming the utmost good faith on the part of Smith, it appears that Leonard was the first inventor of the system described in his patent, for, as already observed, there is nothing in the case to show that Smith ever disclosed his invention to any person whomsoever before November 5, 1891.

Claims 1 and 2 of the patent in suit purport to be method claims. They are as follows:

"(1) The herein-described method of changing the speed of an electric motor, which consists in maintaining upon each one of three or more conductors a potential different from that which is maintained on any other one of the conductors, and connecting the armature terminals of the motor with different pairs of said conductors, substantially as set forth.

"(2) The herein-described method of varying the speed of an electric motor, which consists in maintaining its field magnet at a constant strength and connecting its armature terminals with one or another of two or more constant potential sources, the potentials of which are different."

The defendant contends that these two so-called method claims disclose no method save that described in patent No. 463,802. To support this contention reference is made to the language of the specification of the patent in suit above quoted, whereby the patentee ex-

pressly declares that one of the objects of his present invention is to carry out the method described in his former patent. But it seems to me that the construction thus contended for is too narrow. The method here described saves the cost of the intermediate transforming devices of the former patent, and also avoids the loss of electric energy caused by those transforming devices. It sacrifices the expensive method of securing refinement of control of motor speeds, described in the former patent, for a less refined, but commercially a more useful, method of control. In the Telephone Cases, 126 U. S. 531, 8 Sup. Ct. 780, 31 L. Ed. 863, a claim of one of the patents under discussion was as follows:

"The method of, and apparatus for, transmitting vocal or other sounds telegraphically, as herein described, by causing electrical undulations similar in form to the vibrations of the air accompanying the said vocal or other sounds, substantially as set forth."

The court said:

"The language of the statute is that 'any person who has invented or discovered any new and useful art, machine, manufacture or composition of matter' may obtain a patent therefor. Thus, an art (a process) which is useful is as much the subject of a patent as a machine, manufacture, or composition of matter. Of this there can be no doubt, and it is abundantly supported by authority."

In each of the claims now under consideration, the method therein described reveals an art, or process, which consists in so controlling electric force as to make it accomplish a new result not theretofore secured. Neither of them can properly be regarded as reciting the mere function of the apparatus therein mentioned. I think these claims set forth patentable processes in advance of anything contained in Leonard's patent, No. 463,802.

But the defendant further insists that the claims are void because of certain proceedings in the patent office while the application for the patent was pending there. In the course of those proceedings, after the Smith patent had been granted, Leonard was notified that the examiner in charge of his application had concluded that claims 1, 2, 3, 4, 5, 6, 7, and 11 of his application were met by patent No. 471,063 of Rudolph C. Smith, and that in order to obtain an interference with the claims of that patent the applicant should file an affidavit under rule 75 of the Rules of Practice. Instead of adopting this course, Leonard amended some of his claims and canceled others, and thus avoided an interference and eventually secured the patent in suit. Amongst the claims canceled was the then third claim. The canceled third claim was as follows:

"(3) The combination with three or more conductors, upon each one of which is maintained a potential different from that which is maintained on any other one, of an electric motor and switching devices whereby the armature of the motor may be connected between different pairs of said conductors, substantially as set forth."

Comparing this claim with method claim 1, Mr. Richard Eyre, the defendant's expert witness, said:

"No argument can be advanced that can make these two claims relate to different combinations. Leonard deliberately avoided an interference, cancel-

ing a claim for that purpose, and retaining an identical claim, except that in form the canceled claim was drawn to apparatus, while the claim retained purported to be a method claim. I need hardly point out that it would be impossible to employ the apparatus in the way set out in the canceled claim without practicing the supposed method of the retained claim."

Conceding, for the purpose of the argument, that method claim 1 and canceled claim 3 are the same in substance and differ only in form, no authority has been referred to holding that, if one of several claims in an application for a patent be canceled while the application is pending in the patent office, a retained claim substantially the same as the canceled one is thereby annulled. If the retained claim be susceptible of two or more constructions, it is a well-settled rule that it will not be so construed as to make it the equivalent of the canceled claim; but, if two claims in an application for a patent should inadvertently be expressed in identical language, the withdrawal or cancellation of one of them would not affect the other.

But the two claims are not substantially the same. The conclusion is irresistible that the patent office did not so regard them, for otherwise claim 1 would not have been allowed. Claim 1 is for a process. The rejected claim was for a mechanical combination. It is true that the combination described in the rejected claim seems to be described in claim 1. But that fact does not lead to its rejection. In the great case of O'Reilly v. Morse, 56 U. S. 118, 14 L. Ed. 601, the Supreme Court said:

"The provisions of the acts of Congress in relation to patents may be summed up in a few words. Whoever discovers that a certain useful result will be produced, in any art, machine, manufacture, or composition of matter, by the use of certain means, is entitled to a patent for it; provided he specifies the means he uses in a manner so full and exact that any one skilled in the science to which it appertains can, by using the means he specifies, without any addition to or subtraction from them, produce precisely the result he describes. And, if this cannot be done by the means he describes, the patent is void. And, if it can be done, then the patent confers on him the exclusive right to use the means he specifies to produce the result or effect he describes, and nothing more. And it makes no difference, in this respect, whether the effect is produced by chemical agency or combination, or by the application of discoveries or principles in natural philosophy known or unknown before his invention, or by machinery acting altogether upon mechanical principles. In either case he must describe the manner and process as above mentioned, and the end it accomplishes. And any one may lawfully accomplish the same end without infringing the patent, if he uses means substantially different from those described."

It seems to me that the method claims of the patent in suit comply with this rule, and that the rejection of the original third claim does not necessitate a construction so limited as to annul them.

The last question to be considered is: Is the defendant's system of electric distribution an infringement of the Leonard patent? In their brief, the counsel for the defendant say:

"It is a characteristic feature of the defendant's system, patented to it in the Dunn patent, that from the four wires are obtained six voltages or electrical pressures which differ from each other in proper sequence by equal amounts; that is to say, the voltages are in ratios of 1, 2, 3, 4, 5, and 6, and the resultant speeds will have the same ratios. As illustrated in the patent, the highest voltage is 240, and the steps are 40, 80, 120, 160, 200, and 240. But these numerical values may be modified indefinitely. It is the ratios that are important."

The different voltages shown by the diagram illustrating the Leonard system, above given, are 62.5, 125, 187.5, 250, 375, and 437.5. The ratios here are 1, 2, 3, 4, 6, and 7. The following diagram illustrates the defendant's system:

It will be observed that in the defendant's system the voltages and speeds increase regularly in arithmetical progression; but in the Leonard system they also increase regularly in arithmetical progression, except that one of the steps is twice as great as any of the others. In both systems the same principle is applied. There is nothing in this "characteristic feature" of the defendant's system that distinguishes it in any material respect from the Leonard system. It may be observed, further, that the Dunn patent was not applied for until June 18, 1903, while the bill in this cause was filed June 12, 1902.

In considering the claims of the patent separately, the defendant argues that claims 1 and 2 are not infringed because of the limited construction that it insists must be given them in view of the cancellation of the old third claim above referred to. This point is disposed of by the conclusion already expressed that the construction of the claims is not affected by the cancellation of the original third claim.

Claims 3, 5, 6, and 7 constitute a group distinguished from the other claims by reason of the fact that they each refer to a common return conductor. The defendant insists that the system used by it has no such common return conductor as these claims specify. The counsel for the complainants on their direct examination of Mr. Wagner, their first expert witness, questioned him only as to claims 1, 2, 4, 8, and 9. At the beginning of Mr. Wagner's cross-examination, in answer to an inquiry from defendant's counsel, complainant's counsel stated that they expected to rely on no other claims. Later, they changed their minds, and introduced testimony concerning an alleged infringement of claims 3, 5, 6, and 7. I think infringement of these claims has not been shown. Mr. Wagner admits that in the defendant's system there is no wire to which like poles of all the sources are directly connected. Dr. Crocker, an expert witness for the defendant, says:

"The term 'common conductor' has an exceedingly definite significance in electrical engineering, and it applies perfectly to a particular one marked C in Fig. 1 of the patent in suit. This conductor is permanently connected to one terminal of each of the three generators, and is therefore common to them. In defendant's system there is no conductor corresponding in this respect."

It seems to me this is a fair statement of a material difference between the two systems.

The argument of the defendant that claims 4, 8, and 9 of the Leonard patent are not infringed is based on the theory that the Smith patent must be considered as a part of the prior art. The essential feature of these claims is that they require, between every pair of wires in the system, a difference of potential different from that maintained between every other pair. Mr. Eyre says:

"Claims 4, 8, and 9 only differ from the specific illustration of the Smith patent in that they require a different difference of potential between every pair of the three or more conductors. In other words, these claims in language differ from Smith's specific showing, only because Smith shows as an illustration 'the three-wire system of distribution, as that is the most common system in use.' I cannot think that this is a substantial differentiation, as Smith specifically states that he may employ any other multiple-wire system having more than three wires, and I propose to show that multiple-wire systems having different differences of potential were well known."

But we have already seen that the Smith patent is not an anticipation of the Leonard patent. Leonard was the first inventor of the system he describes, and is entitled to protection as such inventor. Barnes Automatic Sprinkler Co. v. Walworth Mfg. Co., 60 Fed. 605, 9 C. C. A. 154.

In my opinion the defendant must be held to have infringed claims 1, 2, 4, 8, and 9 of the patent. There will be a decree to that effect.