## O'DONNELL v. HARTT.

### Patent Appeal No. 3400.

Court of Customs and Patent Appeals.
Feb. 25, 1935.

*Writ of certiorari denied 55 S. Ct. 657, 79 L. Ed. ——.

196

Walter F. Murray and Frank L. Zugelter, both of Cincinnati, Ohio, for appellant.

A. D. Salinger, of Boston, Mass., for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

BLAND, Associate Judge.

This is an appeal by the senior party, O'Donnell, from a decision of the Board of Appeals of the United States Patent Office, affirming a decision of the Examiner of Interferences awarding priority of invention to the junior party, Hartt, of all the counts in this interference proceeding, which counts are numbered 1, 2, 3, and 4, and which were suggested to the senior party by the Examiner. The counts are as follows:

"1. That improvement in *methods* of securing a binding coated with meltable adhesive to the edge of a shoe upper, which consists in sewing one edge of the binding to the edge portion of the upper, *blowing a hot gaseous fluid against the adhesively coated surface* of said binding and thereby rendering said coating tacky, folding the binding over the edge of said upper and against the margin thereof and, while said coating is still tacky, pressing said tacky surface against said margin.

"2. That improvement in *methods* of securing a binding coated with meltable adhesive to the edge of a shoe upper, which consists in sewing one edge of the binding to the edge portion of the upper, *blowing hot air against the adhesively coated surface* of said binding and thereby rendering said coating tacky, feeding said binding past the point of application of the hot air thereto, and during said feeding operation and while said adhesive is still tacky, folding the binding over the edge of said upper and pressing the tacky surface of the binding against the margin of the upper.

"3. That improvement in *methods* of securing a binding strip coated with a meltable adhesive to the edge of a shoe upper, which consists in fastening one edge of the binding to the margin of the upper, *blowing a hot gaseous fluid against the adhesive coating* on the surface of said binding, feeding the edge of the shoe upper and the binding past the point at which the said fluid is directed against said coating and thereby progressively rendering said coating tacky, and progressively folding the binding over the edge of said upper and pressing it down upon the margin thereof as successive portions of the coating become tacky.

"4. *In a machine* for folding a strip of edge binding material coated with a meltable adhesive about the edge of a shoe up-

per, or the like, comprising, in combination, folding devices for acting on said strip to fold it across the edge and to press it down upon the margin of the upper, means for feeding the work past said devices, *and means for directing a current of hot gaseous fluid against the adhesive coating* on said binding while it is being so fed to render said coating tacky for the operation thereon of said devices." (Italics ours.)

The subject-matter of the counts relates to applying, in a manner stated in the counts, a hot gaseous fluid such as hot air against the adhesive coating of tape which is used in affixing French binding to shoes. It will be noticed that the first three counts relate to *methods* which involve *blowing* a hot gaseous fluid, etc., while count 4 is for a *machine* which, in combination, includes "means for directing a current of hot gaseous fluid against the adhesive coating, etc."

The Examiner of Interferences held that Hartt was the first and only inventor because of lack of originality in O'Donnell, and that the only patentable feature of the counts was "derived by O'Donnell from Hartt." He did not consider the records of the two parties upon the question of which was the prior inventor, independently of the question of originality.

Upon appeal, the Board of Appeals, after expressing doubt as to the correctness of the reasons given by the Examiner of Interferences on the question of originality, concurred in his decision. The Board, however, went further than the Examiner of Interferences, and stated: "In view, however, of the possibility of differences of opinion as to the question of originality, we deem it advisable to investigate and rule upon the evidence, while regarding the parties as independent inventors, although the examiner has not done this."

The Board then holds, in substance, that Hartt had reduced the invention to practice in February, 1928, and that O'Donnell's proof of reduction to practice in January, 1928, was not satisfactory, largely on account of the fact that no documentary evidence was submitted.

█ Appellant filed his application on November 8, 1928, while appellee filed his application on June 3, 1930, about nineteen months later. Since this is an interference between copending applications, it devolved upon the junior party, Hartt, to prove by a preponderance of the evidence that he was the prior inventor.

█ In passing upon the first question for decision here, originality, the Examiner of Interferences said: "It is not thought that there can be any serious doubt that the idea of using hot air in this manner originated with Hartt and was disclosed by him to O'Donnell. Hartt testifies (Q. 168, XQs. 276 and 277) that such a disclosure was made and this testimony is corroborated by Berryman (Q. 36) who was present when the disclosure took place. Moreover, O'Donnell (Q. 5) admits that "Hartt asked me 'Did you ever use a gas flame' this was an entirely new source of heat 'or did you ever use a hot gas' and I told him 'No.'"

O'Donnell does not expressly admit that Hartt suggested blowing the hot air but both Hartt and Berryman testified that a blast was suggested and O'Donnell has not denied this. Moreover, it is thought that the suggestion of applying hot air is sufficient to convey the idea of blowing it, this being the obvious method of applying it.

It is held that the only patentable feature of the counts was derived by O'Donnell from Hartt. The senior party, therefore, is not an original inventor and cannot prevail under any circumstances.

On this phase of the case the Board of Appeals said: "The Examiner of Interferences has pointed out that the only novelty over the art was in the substitution of a hot blast for other heating means and he has held that the above conversation constitutes a complete disclosure of the invention to appellant. We regard this as a very close question. *It is unusual to rest priority on a casual question of that nature without any suggestion of a means for carrying the improvement into effect.* We also note that the query in regard to hot gas does not specify the blowing or directing of a current of hot gas against the adhesively coated surface. It is theoretically possible that a statement of this nature might refer to some other manner of utilizing the hot gas. We believe, however, that to one skilled in the art the obvious suggestion would be that the hot gas would be directed or blown against the surface to be heated and after careful consideration we are of the opinion that the examiner was justified, in view of the state of the art, in holding that the invention was conveyed to appellant by the party Hartt. (Italics ours.)

The first question squarely presented here is: In view of the fact that the only inventive feature of the counts rests in directing or blowing a hot gaseous fluid or

hot air, or a current of hot gaseous fluid, against the adhesively coated binding, did the words used, under the circumstances related, which O'Donnell admits were used by Hartt, constitute a disclosure to O'Donnell of the invention involved in the counts. According to the Board, the disclosure rested in the following question which Hartt asked O'Donnell: "Did you ever use a gas flame or did you ever use hot gas?" to which question O'Donnell answered, "No." O'Donnell stated that the conversation, in which Hartt asked him the above question and he made the above answer, took place in Boston at the time of the Style Show, which was held in January, 1928.

Certain other admitted facts should be considered in connection with the above question and answer, not for the purpose of showing that Hartt made more of a disclosure to O'Donnell than is above set out, but for the purpose of showing whether the suggestion of Hartt, in the light of subsequent activities on the part of both parties, was such a disclosure as is defined under certain authorities hereinafter cited.

O'Donnell lived in Cincinnati, Ohio, was president of the O'Donnell Rubber Company, and had employed Hartt, the appellee, to represent said rubber company in the eastern territory which included Boston and adjacent territory. O'Donnell was concerned in selling the rubber company's tape, used in the shoe industry, and was concerned in placing in the shoe factories using such tape taping machines and tape-applying equipment. In 1926 O'Donnell made a sales contract with Griess, Pfleger & Co. of Cincinnati, Ohio, under the terms of which the latter company undertook the selling of the tape manufactured by O'Donnell's company. Hartt was to be continued as an employee of Griess, Pfleger & Co. in handling O'Donnell's products. The relations between O'Donnell and Hartt were very intimate and friendly, and so continued until long after appellant had filed his application for a patent. O'Donnell paid a part of Hartt's salary while he worked for Griess, Pfleger & Co. This occurred after said company had reduced Hartt's salary. Hartt kept O'Donnell informed as to business conditions in the territory in which Hartt was selling O'Donnell's products. Both were interested in keeping informed as to all developments relating to O'Donnell's products, and O'Donnell frequently was called upon by Hartt during the above employment for prices and equipment for furthering the sales activity in the territory. It is definitely shown that prior to the above question, which O'Donnell concedes that Hartt asked him in January, 1928, O'Donnell had been talking with Hartt with reference to some process of heating the adhesive on the tape other than that which had been employed up to that time, which consisted in applying to the tape hot irons, etc. O'Donnell states that at the Style Show in January, 1928, he had demonstrated to Hartt the effect of using lighted matches to heat the adhesive strip and that it was on the occasion of doing so that Hartt inquired: "Did you ever use a gas flame or did you ever use hot gas?" It is admitted that prior to Hartt's inquiry, O'Donnell had demonstrated the effect of holding lighted matches under the adhesive. Hartt testified as follows: "Q. 40. Just how you came to conceive or think of it. A. Mr. O'Donnell had been bringing coated binding east from time to time and displaying it, and lighting matches to heat the adhesive. I realized that there had to be some sort of appliance put on the machine, on the French cord folding machine, to apply this properly. So I got to thinking of various things, mechanical devices that would heat the binding. * * *"

The following testimony by O'Donnell, we think, in the view of later developments, is important to consider. Referring to the time early in January when he was in Boston for the Style Show, O'Donnell said:

"* * * During that time I showed Hartt samples of heat plastic binding and the heat plastic binding applied to shoes. I had been trying innumerable amounts of experiments over the last two or three years. The possibilities of doing it looked good. In the course of our conversation Hartt asked me, 'Did you ever use a gas flame?' this was an entirely new source of heat 'or did you ever use a hot gas?' and I told him 'No,' I had been using Hot-Points and had been using the duck-beak and had been using hot cartridges. * * *

"I left the Eastern Territory to go back to my plant to see how production was getting along back there, and on coming into my plant on or about the 11th or 12th of January I went down into the experimental department. I got hold of a piece of quarter-inch iron pipe, heating it over a gas flame, which we had used to bend our take-off brackets with. The take-off bracket is a part of our taping machine. Heating up the pipe, I said to Ed Groh, 'Ed, sit down at that machine. I'll show you what we can

do with this hot gas.' I then took the pipe with a pair of pliers, held it near the feeding wheel of a G Model French folding machine, blew through the pipe, using my own lungs to propel it, and placed the heated air on the strip of heat-plastic binding that had been attached to a shoe upper, blowed and heated the adhesive. Ed Groh started the machine and the operation continued, finishing the upper. This was the first time that I had ever seen French binding put on a shoe in this manner."

From the foregoing, it seems reasonable to conclude that either what O'Donnell heard Hartt say or what he independently conceived at that time must have caused O'Donnell to start work on the invention promptly after his return to Cincinnati. For the purposes of this case, we must assume, we think, that O'Donnell must, at least, have received from Hartt a stimulation for further experimentation in the application of hot air or hot gas to the adhesive material.

Now, in the light of the facts above recited, can we say that Hartt has proven that O'Donnell received the invention from him? Limiting the disclosure solely to the question asked and O'Donnell's above-recited activities, we must conclude that Hartt did not disclose the invention to O'Donnell. To have disclosed the invention to O'Donnell, Hartt must have had a complete conception of the invention himself, and a conception of the invention includes the element or act of blowing or directing a current of hot air or gas as a part of the method, or as an element of the means, for attaching the French binding. If we do not accept the proof of independent reduction to practice on the part of Hartt prior to his conversation above referred to with O'Donnell, we are without proof that at the time Hartt asked the question he had anything more in mind than the hazy notion that hot air or hot gas, if applied in some way, might bring about the desired result. The counts are restricted to *blowing* hot air or hot gas or *directing currents* of hot air or hot gas. As the Board intimates, it is possible that the air might be brought in contact with the adhesive in some other manner. Possibly it might be done by passing the tape through a uniformly heated chamber containing air or gas, but which air or gas was not *blown* or *directed*.

If Hartt at the time he claims to have disclosed his invention to O'Donnell had in mind no "means," as is called for by count 4, of bringing the hot air in contact with the adhesive, it is difficult to see why he should now be given priority of an invention which includes all means of blowing hot air or hot gas, or directing currents of hot air or hot gas against the adhesive. If confined to the above statement of facts, it seems to us that at the time Hartt claims to have disclosed his invention to O'Donnell, he did not have a conception of the completed invention of the counts at bar. If he did not have a complete conception of the invention, he could not have disclosed it to O'Donnell. Since a conception must consist "in the complete performance of the mental part of the inventive act" (Underwood's Interference Practice, 1928, § 69), the facts in this case suggest the applicability of the case of Standard Cartridge Co. et al. v. Peters Cartridge Co. (C. C. A.) 77 F. 630, 645, where the court said:

" * * * For the purpose of this branch of the case, we shall assume that Ligowsky disclosed to Hisey, during 1887, all that he had done or conceived about the construction of a cartridge loading machine embodying an endless belt carrier. If Ligowsky's conception was at that time sufficiently developed and perfected to enable one familiar with the construction and operation of the old type of machine to construct a cartridge loading machine embodying the novel features described in the interference issue by the exercise of mechanical skill, and without further invention, he, and he alone, is the first inventor, and Hisey is merely attempting to appropriate the conception of Ligowsky. On the other hand, *if Ligowsky had only an inchoate idea that in some way an endless belt carrier, suitably actuated, might be devised, which could be substituted for the old rigid circular carrier, but did nothing towards developing and demonstrating the utility of his conception, he would not be an inventor at all. The mere existence of an intellectual notion that a certain thing could be done, and, if done, might be of practical utility, does not furnish a basis for a patent, or estop others from developing practically the same idea.* Agawam Co. v. Jordan, 7 Wall. 583–602 [19 L. Ed. 177]; Christie v. Seybold, 6 U. S. App. 544, 5 C. C. A. 33, and 55 F. 69. * * *" (Italics ours.)

The case at bar is even stronger than the Standard Cartridge Co. Case, supra, inasmuch as the question itself did not suggest that Hartt had the notion that what he claims he disclosed had been or could be done.

The case of Marder v. Dey, 32 App. D. C. 593, which involved broad counts like the ones at bar, we think is also in point in the instant proceeding. There it was said:

"We are far from satisfied that the mere suggestion that a device attached to an entirely different mechanism be added to a time recorder completed the invention, and, unless the invention was complete, Marder 'was inventing, *but had not invented,* and he must have invented before the law will come to his protection.' Mergenthaler v. Scudder, 11 App. D. C. 264. 'Invention consists of the conception of the idea *and of means for putting it in practice and producing the desired result.*' Burson v. Vogel, 29 App. D. C. 388. * * *

"We conclude that the Commissioner was right in ruling that *Marder's conception embraced merely the result desired, 'without any definite idea of the manner in which the same could be accomplished.'* * * *" (Italics ours.)

The facts in Alden v. Dewey, 1 Fed. Cas. 329, No. 153, 1 Story, 336, are quite similar to those at bar. The following is quoted from the facts set out in the case: " * * * Daniel Draper testified, that, in conversation with Dexter Peirce, the patentee, sometime at the end of the winter, or beginning of the spring of 1835, he remarked, that he found great difficulty in suiting his customers, in respect to the nibs of scythe snathes; and that he thought they might be improved by the application of the nut and screw to the nib or thole. He did not suggest any mode of doing this. He never reduced his idea to practice. * * *"

In this case, Circuit Justice Story submitted to the jury the following question and statement: "Did Draper communicate to Peirce substantially the improvement, for which he took out his patent, so that, without more inventive power, Peirce could have applied it? It was not enough, that Draper gave a hint; nor, on the other hand, was it necessary, that he should communicate every minute thing about the invention; but he must have communicated the substance. * * *"

See, also, Watson v. Belfield et al. (C. C.) 26 F. 536; Fenner v. Blake, 30 App. D. C. 507; Mergenthaler, etc., Co. v. Scudder, 11 App. D. C. 264; and Union Paper Collar Co. v. Van Dusen, 23 Wall. 530, 562, 23 L. Ed. 128.

Now, as to whether or not at the time Hartt asked O'Donnell the above question, Hartt had in mind means which he had theretofore reduced to practice, we will have more to say later, since if it is found that Hartt had at that time in fact reduced his invention to practice, nothing he disclosed to O'Donnell would make any difference in the result.

For the reasons above stated, we hold that Hartt has not shown that he disclosed his invention to O'Donnell so as to require the holding that O'Donnell was not an original inventor.

■ We will now proceed, as the Board did, to consider Hartt's case of reduction to practice. To begin with, it must be conceded that unless Hartt reduced his invention to practice in the manner and at the time he claims he did in or about the last of February, 1928, he cannot be awarded priority in this interference, since it must also be conceded that O'Donnell did reduce his invention to practice at least as early as March, 1928, and whether O'Donnell reduced to practice in March instead of January is immaterial.

The record is voluminous and contains the testimony of many witnesses. Many different things are relied upon by both parties to cast reflections upon the credibility of the testimony of the opposite party. We, necessarily, cannot attempt to even recite, in substance, or discuss all the different parts of the testimony and other proof which is regarded as material by the parties.

Hartt states that in the latter part of February (and not in January), 1928, he had a conversation with O'Donnell in Hartt's office in Lynn, Mass., in which he fully disclosed his invention and explained his device, Exhibit 3, to O'Donnell. He does not remember the language he used. Neither does his corroborating witness, Berryman, who testified that he was present at the time and heard Hartt fully disclose his invention. Berryman was in the trucking or express business and subleased a part of his office to Hartt in Lynn, Mass. Berryman was asked what language was used and stated that: "I heard him tell him that the only way to put that binding on was to use a hot air blast." It should be recalled that at the time this conversation took place, or prior thereto, O'Donnell, in Hartt's presence, had demonstrated the effect of hot air coming from burning matches. Berryman admitted that while there he did not see Hartt's device, Exhibit 3, or any part of it, which Hartt states that he then had in the desk in the office in which they were located while he was

talking to O'Donnell. Berryman testifies that he heard arguments and conversations between O'Donnell and Hartt with reference to taping machines, but states that he did not know what kind of machines they were arguing about. Hartt explains that he did not show O'Donnell the heating device, which, when attached to the taping machine and used with a garden spray, is now claimed to be evidence of complete reduction to practice, and which device he then had in his desk, for the reason that it was not "set up at the time, not complete."

If Hartt explained the device, as he says he did, it is unthinkable, in view of the friendly relations between them, and what both parties were seeking to do, that Hartt should not have, at the time of explaining the device, shown it to O'Donnell, or at least have shown the important heating element he then had at hand. In our judgment, this fact alone, in view of the burden that is upon Hartt in this proceeding, would go far towards justifying the conclusion that Hartt had not satisfactorily established the fact that he had at that time reduced the invention to practice. There are a number of other circumstances, some of which need not be recited here, which also should be taken into consideration in holding such proof as is offered by Hartt to be unsatisfactory proof of reduction to practice.

Hartt's witness, Donahue, who was at one time superintendent of Daly Factory No. 1 in Lynn, Mass., in which city Hartt's office was located at the time Hartt claimed to have reduced his invention to practice, testified to seeing the operation of said Exhibit 3 in February, 1928. In view of the importance of this critical date, Donahue's testimony is of no great value in establishing the time at which Hartt's activities took place, since he does not definitely fix the time by relying upon any documentary evidence. He fixes the date by making reference to the fact that when he first intended going, he failed to do so on account of being required to go to Manchester to get some data which he needed for making the joint income tax return of himself and wife, and that he did go to Hartt's shop on the following Saturday. Since the making of income tax returns was, no doubt, a yearly practice on the part of this witness, it is not thought that the circumstance referred to can be relied upon to definitely fix the time as being in the year 1928.

Hartt's witness, Donovan, who had charge of the rotary folding machines in the Daly Golden Rule Shoe Company's plant at Lynn, Mass., testified that the number of the machine which Hartt borrowed to use in connection with his hot air device (and it was shown that he had only borrowed one) was No. 153. He stated that Hartt borrowed it on February 24 and returned it on April 17, 1928, and that he refreshed his recollection from notes found in his pocket memorandum book, which notes were in his handwriting. In said book, opposite the number "153," representing the number of the machine, in a darker colored ink than the other items on the page, appears the date "Feb. 24" and above this date is the name "Hartt," and near the name "Hartt" is the small letter "o." At the right of the February date is the date "Apr. 17.28," and above the figure "17" is the word "in." Donovan attempted to explain that the note showed that Hartt took the machine out on February 24 and returned it on April 17. He states that both dates were made at the same time, about April 17, 1928. The date "Feb. 24" is the important date, and on being asked why on April 17 he felt it was necessary to set down "Feb. 24," which was the date the machine was taken, he answered as follows: "What is the purpose of a record anyway? If my firm wants to know where a machine is, in or out, they have a right to know at any time."

This is hardly a satisfactory explanation for the entering of the date "Feb. 24," and certainly has little weight as corroborating Hartt's testimony that he had completed the invention at about that date. Moreover, this character of testimony weakens the whole of appellee's contentions as to the time he was conducting his experiments.

Another of Hartt's corroborating witnesses was Anna Montague, who stated that she had hoped to get employment from Hartt in operating the machine and that she had operated a rotary French cord pressing machine for a number of years. She testified that in the early part of 1928, Hartt had spoken to her about coming to his shop to do some French binding or folding, and that the first time she went was on February 22, 1928, which was Washington's Birthday. She stated that when she got there he did not have any folding to do and that then she went on the following Saturday, and that he was operating on Exhibit 3 using hot air, and that she operated the folding machine to a considerable extent, and that it did "wonderful" work. On cross-examination she was not able to tell where she was on

Washington's Birthday in either of the years 1927 or 1929. Her testimony was taken in 1932. She stated that Berryman was present.

Berryman testified that he was present when Miss Montague operated the machine, and that it was about midwinter of 1928, about February. Hartt stated that his conversation with O'Donnell was in the latter part of February or in March, 1928, and that Berryman was present. It seems strange that if Berryman was present when Hartt explained his device, the essential part of which he then had in his desk, neither of them would have made mention of what had been done while Miss Montague was present. This is especially true in view of the fact that up to that time and for quite a period afterwards the record as a whole indicates clearly that Hartt was attempting in every way to assist O'Donnell in bringing about the desired improvement in the machine. Moreover, it is not explained why Hartt would have asked Miss Montague to come to work on a rotary binding machine with his attachment, if at the time he did not have the rotary machine which, according to Hartt's Exhibit 24, was not obtained by him from Donovan until February 24.

The brief lead pencil notations in Hartt's memorandum book, Exhibit 1, have little probative force. The notes relating to matters involved in this case all appear to be made with the same pencil. The appearance of other notes not concerned with the invention at bar, made on and about the dates hereinafter quoted, seem to have been in the book much longer than the notes relied upon as corroborative of the testimony of Hartt and the other witnesses involved. The earlier and later dated data in the book have a somewhat smudged appearance because of the use of a soft pencil, and also apparently on account of the difference in the actual date of entry. The notations referred to are: "Hot-air idea," under the printed date of Tuesday, February 14; "Annie Montigue at office," under printed date of Wednesday, February 22; "Rotary Mch from Daly's No. 1 Fcty for Hot-air," under printed date of Friday, February 24; "Annie Montigue tried out leather on Fr cord hot," under printed date of Saturday, February 25; "Jack Donohue at office saw Heat Unit," under printed date of Saturday, March 3; and "Returned Rotary Mch No. 153," under printed date of Tuesday, April 17. Why would Hartt note the date when "Anna Montague came to his office on Feb-

ruary 22, since on that occasion she went away because she had no machine to work on? This character of proof, when offered, not only lacks probative value, but, we think, makes appellee's proof as a whole less satisfactory.

Appellee's conduct, in respects not heretofore referred to, does not seem to us to be in harmony with the fact that he regarded himself as an inventor at the early period claimed by him. Moreover, the record shows on the part of Hartt an inclination to mislead either the party O'Donnell or his new employer as to who was the inventor of the subject-matter here involved. The letters which have been introduced in evidence indicate that Hartt was willing to have O'Donnell believe that O'Donnell was the inventor and at the same time wished to give the impression to his new employers that he (Hartt) was the inventor.

A number of letters and telegrams were introduced to show, and we think do show, that Hartt, long after the date upon which he claims to have completely reduced his invention to practice, treated the invention as O'Donnell's rather than as his own, and although he had in some of the communications appeared to claim credit for suggesting the idea of hot air to O'Donnell, he never at any time for a period of about two years disputed O'Donnell's right to a patent or indicated any intention of seeking a patent himself. We think this attitude on the part of Hartt is a proper matter for consideration in determining what weight and effect is to be given to his own testimony and the proof he has offered.

The above considerations, which have been mentioned as showing weak phases of appellee's case, are not suggested with the view that any single one of such circumstances is regarded as controlling, so as to justify the rejection of appellee's proof, but we think that all these circumstances, when considered together, fully justify the conclusion that appellee's proof is not satisfactory to meet the requirement of the burden placed upon him.

We think the record shows that O'Donnell was the first to conceive and first to reduce to practice the invention involved in the counts. It becomes immaterial to consider appellee's criticism of O'Donnell's proof which goes to the question as to whether O'Donnell's reduction to practice was in January or in March of 1928, since O'Donnell's reduction to practice was clearly prior

to any reduction to practice satisfactorily proved by Hartt. In view of our above conclusions, Hartt cannot rely upon the weakness of O'Donnell's proof, but must depend on the strength of his own.

The decision of the Board of Appeals is reversed, and priority of invention defined by the counts at issue is awarded to the senior party, O'Donnell.

Reversed.