William R. POLYE, Appellant,

v.

Herbert Bennett UHL, Appellee.

Patent Appeal No. 7087.

United States Court of Customs and Patent Appeals.

March 12, 1964.

Herbert L. Davis, Peterboro, N. J. (Roland Plottel, New York City, Emory

C. Naylor, Washington, D. C., of counsel), for appellant.

Robert Ames Norton, Stamford, Conn., for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

SMITH, Judge.

This appeal by the junior party Polye is from a decision of the Board of Patent Interferences awarding priority of invention of the five counts in issue to the senior party Uhl, with one member of the board dissenting.

At the time the invention in issue was made, Polye, a physicist, was in the employ of Bendix Aviation Corporation. The Polye application, Serial No. 5,168, filed January 28, 1960, is entitled "Electrolyte for a Sealed Liquid Level Current Control Device." Uhl, at the time of the filing of his application, Serial No. 792,-898, on February 12, 1959, was a chemist employed by American Cyanamid Company. Uhl's application has since matured into U. S. Patent No. 2,927,987, granted March 8, 1960, entitled "Level Switches."

The issue here is fundamentally a legal one. The testimony and facts have been stipulated and except for minor details there is no factual controversy. In summary, the pertinent facts are that prior to the time when the invention in issue was made, Polye had been engaged in studying the problem as to what caused the unexplained exploding of a certain type of electrolytic level switch used in gyro compasses. These switches conventionally included an envelope or container, usually of glass, two or more electrodes, and an electrolyte consisting of an aqueous solution of methyl alcohol and potassium iodide. The amount of electrolyte was such that when the switch was level there was a conducting path between electrodes, but at a predetermined degree of tilt, this path was broken.

After such switches had been in use for some months, the glass envelopes of-

894

ten exploded. In attempting to solve this problem, Polye first theorized that gaseous hydrogen and oxygen might have been formed by hydrolysis of the water in the aqueous solution. Tests indicated that this hypothesis was not correct. Further experiments conducted by Polye and under his supervision indicated that hydrogen gas was liberated by electrolysis of one of the electrolyte components. Hydrogen evolved whenever the switch was conducting and remained uncombined until the accumulated hydrogen gas built up a pressure sufficient to cause the envelope to burst.

The stipulated testimony of Polye states that he

" * * * consulted several standard reference books * * * in an effort to develop an electrolytic switch incorporating a mechanism that would release, absorb, adsorb, or chemically combine with the molecules of hydrogen which it was then believed were liberated by electrolysis so as to provide a mechanism which it was thought might prevent such switch explosion; that on August 22, 1958, the deponent William R. Polye after research in several standard reference books made a written record at page 12 of a Figuring Book No. 1945 issued to the deponent William R. Polye by the Eclipse-Pioneer Division, a photostatic copy of which record is marked Polye Exhibit 3, and in which record the deponent William R. Polye listed several possible solutions of the problem, including the provision of a palladium window in the wall of the sealed electrolytic switch envelope to permit the release of the liberated hydrogen from the sealed switch envelope; the use in the electrolyte of a known getter such as a spongy platinum, platinum black, and zinc oxide for hydrogen absorption and in said record, Polye Exhibit 3, the deponent wrote on August 22, 1958, the notation 'Zinc Oxide—Check absorption by experiment.' "

At the time Polye made the above notation of Polye Exhibit 3 he and Uhl were neighbors and friends, and since both were engaged in technical professions, they often had conversations regarding particularly interesting problems each encountered in his work. On the occasion of a neighborly visit to the home of Uhl, probably on August 28, 1958, Polye engaged in conversation with Uhl about the interesting but difficult problem he had of trying to find a good hydrogen absorber. Uhl then asked Polye why he needed a hydrogen absorber, whereupon Polye told Uhl of the exploding electrolytic switch problem on which Polye had been working. Polye said he was looking for a good hydrogen absorber to put in the electrolytic switch to prevent the accumulation of free hydrogen and had consulted several standard textbooks and had under consideration the use of several known hydrogen absorbers such as spongy platinum, platinum black, zinc oxide, or alternatively, the use of a palladium window in the switch envelope to permit the release therethrough of the otherwise entrapped hydrogen gas.

What next transpired as stated in Polye's stipulated testimony is as follows:

"That after the deponent William R. Polye told the party Uhl of the aforenoted hydrogen absorbers that the deponent William R. Polye had in mind using to absorb the liberated hydrogen in the electrolytic switch, the party Uhl almost immediately volunteered to the deponent William R. Polye the observation that he thought the deponent William R. Polye could do better than that and inquired why the party Polye did not try an unsaturated hydro carbon and on further consideration the party Uhl questioned whether it would work or not, and thereupon the party Uhl got out one of his reference books with the further observation that the only trouble is, it might not work at the pressure and temperature of the switches, which might not be high enough. Upon checking

through the reference book, the party Uhl observed that the material which seemed to hydrogenate at the lowest pressure and temperature was Allyl Alcohol and suggested that the best thing to try might be this Allyl Alcohol."

Uhl's stipulated testimony of this event is as follows:

"That deponent suggested to Mr. Polye that an unsaturated organic compound might be used to react with hydrogen evolved and that such compounds were available which would be thin fluids and . remain dispersed in the electrolyte in the switch both before and after reaction with hydrogen and would not plug up the switch as might occur with materials such as zinc oxide which are solids. That deponent first suggested that perhaps unsaturated hydrocarbons could be used but then almost immediately had some doubts because the lower members of the unsaturated hydrocarbon series are gases and in many cases hydrocarbons require an elevated temperature for hydrogenation whereas the switches have to be used at fairly low temperatures. Deponent then got out a copy of the Handbook of Chemistry and Physics published by the Chemical Rubber Publishing Company, checked the physical properties of allyl alcohol appearing on pages 298 and 299 and suggested that it might be a good material to try as it is thinly fluid and disperses in the electrolyte and the reaction product of the allyl alcohol with hydrogen formed propyl alcohol which . is also thinly fluid and which also would remain dissolved or thinly dispersed in the switch electrolyte. Also temperature problems are reduced as the boiling point of allyl alcohol is not greatly different from that of the electrolyte. A photostatic copy of pages 298 and 299 of the handbook referred to above is annexed and marked Uhl, Exhibit 1. Deponent

stated to Mr. Polye that it probably would be desirable to use a hydrogenation catalyst and mentioned a few of the standard catalysts such as Raney nickel, platinum, etc. Mr. Polye asked whether palladium could be used [and?] deponent agreed that this was another well known catalyst and should be useful. Deponent further stated that allyl alcohol was so reactive that it is possible that it might react with hydrogen sufficiently rapidly even without catalyst but that this ought to be determined by a test.

"The above statements with respect to catalysts were quite brief as the use of catalysts is so conventional that deponent did not feel that it required any extensive discussion."

It is significant, we think, that on the day following this discussion Uhl telephoned Polye and further discussed the problem of the explosion of the sealed electrolytic switch envelope and told Polye that other things such as a group of chemicals called pinenes and alcohol nopol might also be useful as hydrogen absorbers. In this telephone conversation, Uhl and Polye further discussed the probable chemical reaction in the hydrogenation of a double bond hydrocarbon such as allyl alcohol which might be effected by the liberated hydrogen in the sealed switch envelope.

There is no question but that Polye, following these conversations with Uhl, conducted tests on switches using allyl alcohol in the electrolyte which tests resulted in a complete and admittedly successful reduction to practice of the invention in issue in September, 1958.

The issue in this case thus is not whether the reduction to practice was made, but rather *whose invention* was reduced to practice. Stated another way, the question is whether at the meeting with Polye on August 28, 1958, Uhl conceived the invention defined by the counts in issue. It is Uhl's position that he did conceive the invention and disclose it to Polye so that the legal effect of the re-

duction to practice by Polye is that of a reduction to practice of Uhl's invention.

In resolving this issue, we start first with an analysis of the counts to determine the precise limits of the invention in issue. In this connection it is interesting to note that each party in his brief here emphasizes features in the counts which are somewhat inconsistent with the positions taken earlier in their respective patent applications. Thus, Polye in his application states:

"The invention relates to an improved electrolyte for use in a conventional sealed type liquid level current control device and more particularly to an electrolyte which involves a substantial improvement over electrolytic solutions heretofore used in such type devices in that the improved electrolyte is such that substantially no free gaseous products are liberated from the electrolyte during the operation of the current control device."

However, in Polye's brief the position is taken that

"The invention defined by the counts in issue, as shown and described in the Uhl U. S. Patent No. 2,927,987 (R 23–26) and the Polye Application Serial No. 5,168 (R 5–20) here involved is not directed to an electrolyte *per se*, but rather such counts are directed to an improved switch, particularly in view of the following provisions in count 1:

" 'In a level switch comprising a switch body (hollow body 1 of the Uhl patent) partially filled with a solution of an electrolyte (electrolyte 3 of the Uhl patent) in ionizing solvents containing at least one component which on electrolysis sets free hydrogen, the amount of the electrolyte solution being sufficient to permit formation of a gas bubble (4 of the Uhl patent) and electrodes (electrodes 2 of the Uhl patent) from a plurality of circuits extending into the bubble (4) at balance but at least

one of the electrodes being wetted by the electrolyte solution when the switch is tilted, * * *.' "

Polye's brief further emphasizes that it is the improved switch that is claimed in the counts and points out that each count calls for a "switch". On the other hand, Uhl in his patent describes his invention as related to improved level switches, and states:

"Level switches, that is to say switches in the form of a level containing a gas bubble in a liquid and a number of electrodes, are used extensively for the erection of gyrocompasses. The switches present a number of problems. Ordinary tilting switches using mercury as a conducting liquid are not usable as this is a pure on and off switch and cannot provide varying resistances near the center point which are necessary for the satisfactory operation of erecting devices for gyrocompasses and similar uses."

However, the position asserted in Uhl's brief here is that

"The counts set forth old and conventional switch structure and an old and conventional electrolyte which are recited in the preamble. The only change is the addition to the electrolyte of a hydrogen acceptor of definite characteristics or specifically allyl alcohol."

The counts *per se* seem to be sufficiently nebulous to support either point of view, except for the requirement in each count that "at least five percent of a hydrogen acceptor" be present as "a thinly fluid dispersion in the electrolyte."

Count 2 specifies in addition that the hydrogen acceptor is "an unsaturated organic solvent" and calls for the presence of "a hydrogenation catalyst." Count 3, in addition to these limitations in counts 1 and 2, calls for the electrolyte to be "an aqueous alcoholic solution of a soluble halide." Count 4 in addition calls for the electrolyte to be "an alkali metal iodide dissolved in aqueous lower alkanol" and for "the unsaturated compo-

nent" to be an "unsaturated alcohol." It is only after all these limitations are met do we come, in count 5, to the limitation that "the unsaturated alcohol is allyl alcohol."

We think it imperative to keep these claimed features in mind in determining whether the "invention" which Polye reduced to practice in September of 1958 was his own or Uhl's.

Giving the testimony and evidence concerning the August 28, 1958 visit of Polye and Uhl its maximum effect, it seems clear that neither party at that time discussed the "at least five per cent" limitation we find appearing in all the counts. So it is also with the other limitations found in counts 2 through 4. When, however, we consider the allyl alcohol limitation of count 5, only then are we dealing with a specific material suggested by Uhl at the August 28, 1958 discussion with Polye. But it must be noted that count 5 contains in addition all the limitations of the preceding four counts, concerning which there appears to have been no discussion between the parties.

We think the limitations in the counts clearly suggest that there was more to the invention in issue than the mere general suggestion made by Uhl to Polye to use allyl alcohol as a hydrogen getter. The additional limitations in the counts relate to features which were not disclosed by Uhl to Polye. They are, however, the type of limitations which result from the work done by Polye and under his supervision in building and testing the switches in issue.

Uhl's position in his brief is:

"It should be noted that the invention is not a particular critical range of allyl alcohol but its use. Polye's assistant Halliday (R35), used amounts which were convenient. He did not find that a particular narrow critical range was necessary or constituted the invention. The invention was to add allyl alcohol or similar hydrogen absorber which was thinly fluid at the start and re-mained thinly fluid after reaction. This was conceived by Uhl, told to Polye and proved to be true on reduction to practice."

We cannot accept this position. The law is clear that every limitation in an interference count is to be considered material in determining whether a party should prevail. E. g., Segall v. Sims et al., 276 F.2d 661, 47 CCPA 886; Crome v. Morrogh, 239 F.2d 390, 44 CCPA 704.

Thus in O'Donnell v. Hartt, 75 F.2d 195, 22 CCPA 958, 963–964, the court in considering counts restricted to blowing hot air or gas or directing currents of hot air or hot gas said:

"If Hartt at the time he claims to have disclosed his invention to O'Donnell had in mind no "means," as is called for by count 4, of bringing the hot air in contact with the adhesive, it is difficult to see why he should now be given priority of an invention which includes all means of blowing hot air or hot gas, or directing currents of hot air or hot gas against the adhesive. If confined to the above statement of facts, it seems to us that at the time Hartt claims to have disclosed his invention to O'Donnell, *he did not have a conception of the completed invention of the counts at bar.* If he did not have a complete conception of the invention, he could not have disclosed it to O'Donnell. Since a conception must consist "in the complete performance of the mental part of the inventive act" (Underwood's Interference Practice, 1928, § 69), the facts in this case suggest the applicability of the case of Standard Cartridge Co. et al. v. Peters Cartridge Co., 77 F. 630, 645, * * *.

"The case at bar is even stronger than the Standard Cartridge Co. Case, supra, inasmuch as the question itself did not suggest that Hartt had the notion that what he claims he disclosed had been or could be done." [Emphasis added.]

It seems to us that, taking the most charitable view possible of Uhl's position, it is that he had the intellectual notion that allyl alcohol could be added to the switch electrolyte, and that it would probably act as a hydrogen getter. The amount to be used, the nature and composition of the electrolyte and the question of whether or not a catalyst would be required—all limitations found in the counts—are not even vaguely referred to, nor is it seriously contended that they were disclosed by Uhl to Polye. Had the issue of inventorship been joined immediately after the August 28, 1958 disclosure by Uhl, it would have been joined on Uhl's vague suggestion to try allyl alcohol as a hydrogen getter in an electrolytic switch rather than upon the detailed and limited invention defined by the counts. If we consider Uhl's call to Polye of the following day we merely add another intellectual notion, i. e., as stipulated in Uhl's testimony,

"* * * that there might be some other unsaturated organic compounds which would be thinly fluid. Deponent definitely recalls one of these compounds was a pinene. However, deponent recalls that he told Mr. Polye that he still thought allyl alcohol might be better as it is soluble in the electrolyte."

■ The question here, like that arising in connection with defense of prior invention in a suit for patent infringement, requires a consideration of what was done by the person who asserts that he is the inventor of the subject matter in issue. The exact nature of this issue is to be ascertained from the specification and claims. As stated in Agawam Company v. Jordan, 74 U.S. (7 Wall.) 583, 602, 19 L.Ed. 177 (1868):

"* * * The settled rule of law is, that whoever first perfects a machine is entitled to the patent, and is the real inventor, although others may have previously had the idea and made some experiments towards putting it in practice. He is the inventor and is entitled to the patent who first brought the machine to perfection and made it capable of useful operation."

■ There is no showing here that Uhl invented or suggested the entire invention as embodied in the combination of elements claimed in the counts in issue. His suggestion to use allyl alcohol in the electrolyte of the switch therefore is not a conception of the entire invention of the counts. It is rather what the court referred to in Standard Cartridge Co. v. Peters Cartridge Co., 77 F. 630, 645 (6th Cir. 1896) as the "mere existence of an intellectual notion that a certain thing could be done, and, if done, might be of practical utility." As the court there stated, this "does not furnish a basis for a patent," citing Agawam Company v. Jordan, supra, and Christie v. Seybold, 55 F. 69 (6th Cir. 1893).

At most what Uhl did was to render partial aid to Polye. As stated in Agawam Company v. Jordan, supra, 74 U.S. at 604, 19 L.Ed. 177:

"* * * common justice would forbid that any partial aid rendered under such circumstances, during the progress of experiments in perfecting the improvement, should enable the person rendering the aid to appropriate to himself the entire result of the ingenuity and toil of the originator, or put it in the power of any subsequent infringer to defeat the patent under the plea that the invention was made by the assistant and not by the originator of the plan."

It is this salutary principle which underlies decisions such as Land v. Dreyer, 155 F.2d 383, 387, 33 CCPA 1108, 1113, where this court stated the rule:

"The party claiming conception of an invention must show that it was complete and operative and such as would enable a person skilled in the art to reduce the conception to practice without any further research or exercise of the inventive skill. It is not sufficient, therefore, to show that a party claiming an invention has conceived a result to be obtained;

the patentable thing is [that] the means provided and disclosed by him to accomplish that result. See Townsend v. Smith, 36 F.2d 292, 17 C.C.P.A., Patents, 647; Rowe v. Holtz, 55 F.2d 468, 19 C.C.P.A., Patents, 970, and authorities therein cited; Curtis et al. v. Land, 129 F.2d 549, 29 C.C.P.A., Patents 1118.

In our view of the present case, the disclosures of the party Uhl do not fall within the above rule. Accordingly, the decision of the Board of Interference Examiners is reversed.

Reversed.