**Walter C. ALEXANDER, Leo Nordwald and Robert P. Wanger, Appellants,**

v.

**Howard J. WILLIAMS, Francis R. Rogers and Basil J. Ryder, Appellees.**

**Patent Appeal No. 7270.**

United States Court of Customs and Patent Appeals.

March 18, 1965.

Rehearing Denied May 6, 1965.

Irvin H. Rimel, John W. Malley, Washington, D. C. (Harold H. Green, Jr., Cincinnati, Ohio, Frank L. Neuhauser, Washington, D. C., of counsel), for appellants.

Emory C. Naylor, William S. Thompson, Washington, D. C., for appellees.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

ALMOND, Judge.

This appeal by the junior party, Alexander et al., is from a decision of the Board of Patent Interferences awarding priority of invention of the single count in issue to the senior party, Williams et al. Appellees' application [1] was filed on April 5, 1955. Appellants' application,[2] filed May 24, 1955, became a patent [3] on April 5, 1960. The Williams et al. application is assigned to The Bendix Corporation and the Alexander et al. patent is assigned to General Electric.

The invention involved in this interference is a system for controlling fuel flow and stator angle in a jet engine. The sole count is reproduced below.

"For use in a variable stator turbojet engine having a main fuel supply system and a rotor speed governor, a control system for controlling the main fuel supply and for positioning the compressor stator blades including: a compressor inlet temperature sensor; compressor discharge pressure sensor; fuel control means including a first cam mounted on a cam shaft, said control means being connected to said sensors and adapted to be connected to said governor and said supply system for controlling the flow of fuel to the engine as a function of compressor inlet temperature, compressor discharge pressure and rotor speed; and a variable stator blade control including a second cam mounted on said cam shaft, said variable stator control being adapted to be connected to the compressor stator blades for

1. Serial No. 499,432 for "Fuel Feed and Power Control System for Gas Turbine Engines."

2. Serial No. 510,608 for "Variable Stator Engine Control System."

3. U. S. Patent No. 2,931,168.

varying the setting thereof as a function of rotor speed and compressor inlet temperature."

The elements of the count are shown in the following drawing from the Alexander et al. patent:

Fuel flow to the engine is governed by valve 41. The setting of valve 41 is a function of 3 variables: rotor speed, compressor inlet temperature, and compressor discharge pressure. Rotor speed causes rotation of cam shaft 51 by means of governor 17, rack 54 and spur gear 53. Compressor inlet temperature actuates bellows 52 causing axial movement of the cam shaft. Because both cams 49 and 66 are three dimensional cams, both rotation and axial movement of the cams cause movement of the cam followers. Rod 47 thus operates the fuel valve as a function of both temperature and speed. Bellows 45 further controls the valve setting as a result of compressor pressure. Cam 66 which is also positioned as a function of rotor speed and compressor inlet temperature governs the setting of variable stator blades 76.

The facts out of which this interference arose are shrouded by a heavy veil which time has drawn across the memory of the primary witnesses. One undisputed fact of great significance, we think, is that the General Electric inventors were the first to conceive the invention defined by the count. The conception occurred sometime in the latter part of 1952 as is evidenced by drawings (Alexander Exhibit 6) dated November 1952. The fuel control of the drawing was apparently necessitated by the concurrent development of the J–79 turbojet engine with variable stator blades. The J–79 differed from past models primarily by the fact that the stator blades of the compressor were movable rather than stationary. The fuel controller conceived by Alexander was designed to control both fuel flow to the engine and the angle of the variable stator blades.

General Electric apparently decided to buy the control from an experienced fuel control manufacturer rather than produce the units itself. Thus, General Electric planned to develop and produce the J–79 engine while a fuel control manufacturer was independently producing the controller.

In order to select a control supplier, General Electric met with several suppliers including Bendix in January 1953. In February 1953 Bendix made drawings of a controller supporting the count which it alleges represent an independent conception of the invention. In March Bendix was awarded the contract to supply General Electric with fuel controllers. There followed a development period of over two years during which General Electric and Bendix worked closely on the development of a controller for the J–79. During most of this time General Electric and Bendix engineers held bi-weekly meetings. This joint effort extended through 1958. The controller was apparently produced in operational form sometime during 1955. Both parties filed patent applications covering the controller in the spring of 1955.

The junior party contends that it is entitled to an award of priority on three grounds. First, General Electric claims that Williams was not an independent inventor but rather that the invention of the count was disclosed to Bendix prior to any claimed conception date by Williams. Second, it is claimed that Alexander reduced the controller to practice prior to the Bendix inventors' filing date. Third, General Electric claims that Alexander was diligent from just prior to the entry of the Bendix inventors into the field until the filing of the Alexander application.

We will first consider the question of derivation, since it presents issues which must be resolved before the reduction to practice and diligence questions can be properly determined. In order to understand General Electric's contentions, it is necessary to study carefully the meeting between General Electric and Bendix personnel held on January 19, 1953. The purpose of the meeting with Bendix was the same as that of the meetings held with other fuel control manufacturers, to select a supplier of the J–79 controller. The evidence establishes that General Electric did not hand Bendix a drawing of the controller it had conceived and ask them to manufacture it. Rather, General Electric attempted to take advantage of Bendix's experience. On this point, Mr.

Strock, a General Electric representative at the meeting, testified:

"XQ128. Wasn't it a fact that you intended not to influence the thinking of the vendors so that you could get as many different approaches as possible and select perhaps the best from among many different types? A. It was our intent to call out requirements that control system suppliers could not possibly know, such as the parameters that would be used and the degree of sophistication of control that was required.

"Within these boundaries it was our intention indeed not to limit the proposals because we wanted to keep an open mind relative to the various ways of accomplishing the important things that we had in mind as requirements."

In addition to stating requirements at the meeting General Electric supplied Bendix with a document (Alexander Exhibit 1) entitled "General Objectives for Advanced Engine." This document listed the design specifications for the controller. The fuel control is specified as a function of rotor speed, N, and compressor inlet temperature, $\Theta$. It is suggested that the control should be based upon corrected speed, $N/\sqrt{\Theta}$. Compressor pressure is also specified as a means of correcting acceleration fuel flow. The inlet guide vane position is specified as a function of corrected engine speed $N/\sqrt{\Theta}$. Thus, the specifications given to Bendix disclose all features of the count except the use of a cam in both the fuel and stator control and mounting both cams on the same shaft.

We feel the evidence establishes that the use of cams was disclosed to Bendix at the January 19 meeting. Mr. Strock testified that the use of cams in the control had been discussed because General Electric was concerned about the rapidity with which shapes could be changed because the engine characteristics were not fully understood at that stage. He further testified that Mr. Ryder reported progress in reducing design and fabrica-

tion time for cams. Mr. Wanger, one of the General Electric inventors, testified that the detailed mechanical design including cams was discussed at the meeting. Mr. Ryder, the Bendix representative at the meeting and a co-inventor, testified that he remembered discussing cams with General Electric but could not remember at what meeting it occurred. Although the testimony is not unequivocal, we find that the use of cams in the controller was disclosed at the meeting.

The only remaining element of the count is the mounting of both cams on a common shaft. There is no evidence to support General Electric's position that this feature was disclosed at the meeting. The testimony relied upon by appellants merely indicates that details were discussed. Mr. Strock testified on this point as follows:

"Do you recall, at the meeting, any specific discussion of details of this nature, particularly a first cam mounted on a cam shaft and a second cam mounted on the cam shaft? A. I recall that at this meeting we discussed at considerable length the technique described here for controlling the variable stator blade.

"I do not recall our discussion of mounting these two cams on one shaft, and such a discussion would have been largely irrelevant at this meeting because the mounting of two cams on one shaft is a mechanical design detail which is quite normal in the interest of simplicity in a mechanism that is intended to be highly reliable."

Thus, we must hold that the common cam mounting was not discussed.

The board also found that General Electric had not disclosed mounting both cams on a common shaft. The board further stated:

" * * * There is no clear evidence that the General Electric disclosures to Bendix included even a complete conception of cams on *separate* shafts for accomplishment of the combination of functions desired."

The board further found that the specific cam arrangement was the feature that secured allowance of the General Electric patent. The argument by General Electric that the heart of the invention had been disclosed and that only normal skill was required to put the cams on a common shaft was rejected.

The General Electric argument relies upon the following portion of Agawam Co. v. Jordan, 74 U.S. (7 Wall.) 583, 602, 19 L.Ed. 177 (1868):

"No one is entitled to a patent for that which he did not invent unless he can show a legal title to the same from the inventor or by operation of law; but where a person has discovered an improved principle in a machine, manufacture, or composition of matter, and employs other persons to assist him in carrying out that principle, and they, in the course of experiments arising from that employment, make valuable discoveries ancillary to the plan and preconceived design of the employer, such suggested improvements are in general to be regarded as the property of the party who discovered the original improved principle, and may be embodied in his patent as a part of his invention."

While we agree that part of the reasoning in Agawam is pertinent to the issue before us, we note several major distinctions between Agawam and the present case. Agawam dealt with an improvement which was conceived solely by the employee to whom the general plan of the invention was disclosed. Here, the entire invention including mounting of two cams on a common shaft was admittedly conceived first by Alexander. Thus, rather than considering whether an employee's improvement inures to the benefit of his employer, we need only consider whether the subsequent, independently conceived improvement represents the only patentably significant feature of the count.

We feel that this issue can be decided only by considering the invention defined by the count in light of the prior art cited by the examiner.

The board, in holding that mounting both cams on a common shaft was the feature which secured allowance of the claim, referred to the following statement made by General Electric's attorney during the prosecution of the application:

"Claim 5 has been amended to call for a fuel control means including a first cam mounted on a cam shaft, and a variable stator control including a second cam mounted on said cam shaft. These structural details are not taught by the references to Davies et al and Lovesey et al in combination or singly. Even if the variable stator control of Lovesey et al were combined with the fuel control of Davies et al, there is no teaching in either patent of a cam shaft common to both systems with a cam in each system mounted thereon.
* * *"

We find nothing else in the record to substantiate the board's position. Davies discloses only a fuel control system and the only pertinent disclosure of Lovesey is a variable stator blade control system. The references not only fail to show two cams on one shaft, but they also lack a suggestion of using cams in any manner in the system. Furthermore, we find nothing in the above quoted argument of the General Electric attorney that can be construed as a concession that two cams on a common shaft is the essence of the invention. It is merely an argument pointing out that the references do not show a certain feature in the claims. No contention was made that the specific cam arrangement constituted the entire invention.

In the examiner's next action dated February 14, 1957, he cited Best Patent No. 2,759,549 showing a control having a cam shaft operated in response to compressor inlet temperature and speed just as in the present case. The Best cam shaft has three cams mounted on it. The examiner, however, did not rely upon Best for the feature of multiple cams on a

single shaft. It would seem that Best would have been relied upon had the placement of two cams on a shaft been considered the essence of the invention.

The arguments of counsel before the Patent Office are of little value here in interpreting the scope of a claim because there is no clear and unambiguous concession or admission. We find no such statement regarding the scope of the invention as would estop General Electric from arguing that mounting two cams on one shaft was only one of several features of the claimed combination contributing to its patentability. Since Bendix prosecuted claims to the control system in issue without any limitation to cams, it could be argued that they did not even consider the use of cams an essential feature of the invention. We do not feel that claims presented to the Patent Office prevent Bendix from arguing here that such claims are not patentable and, in like manner, we do not feel that the arguments of the General Electric attorney can be used to imply that the essence of the invention is two cams on a single shaft.

Even in the board's opinion, there is a recognition that the invention involves complex factors. The board stated:

"Actually the apparatus conceived by Williams is quite complex, and his contribution can be seen as a simple one only by hindsight. The fuel control is responsive to three functions and the vane control to two of the three, and there is apparently no antecedent in the art for the principle that identical control of the cams would establish a desirable control of both vanes and fuel supply. * * *"

We find particularly apposite to this case our holding in Polye v. Uhl, 328 F.2d 893, 51 CCPA 1067, that a party is not entitled to an award of priority where there is no showing that he "invented or suggested the entire invention as embodied in the combination of elements claimed in the counts * * *." Even in the case where another renders partial aid in perfecting and improving an invention, he cannot "appropriate to himself the entire result of the ingenuity and toil of the originator," Agawam v. Jordan, supra, 74 U.S. at 604. In this case Bendix has not even rendered partial aid since the General Electric inventors had first conceived every element of the count.

Our review of the evidence convinces us that mounting two cams on one shaft was the only feature of the count independently conceived by the Bendix inventors and that this feature is not the entire invention claimed in the count. Thus, because the Bendix inventors did not invent the entire invention, the award of priority to them is reversed.

Reversed.